**TOUSLEY BRAIN STEPHENS PLLC**
Kim D. Stephens, P.S. (OR 030635)
kstephens@tousley.com
Joan M. Pradhan (WA 58134)
jpradhan@tousley.com
1200 5th Avenue, Suite 1700,
Seattle, WA 98101
Telephone:    (206) 667-0249

**LYNCH CARPENTER LLP**
Todd D. Carpenter (CA 234464)
todd@lcllp.com
Scott G. Braden (CA 305051)
scott@lcllp.com
James B. Drimmer (CA 196890)
jim@lcllp.com
1234 Camino Del Mar
Del Mar, California 92014
Telephone:    (619) 762-1900
Facsimile:    (858) 313-1850

*Attorneys for Plaintiff and*
*Proposed Class Counsel*

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## [PORTLAND DIVISION]

| | |
|---|---|
| DEBORAH O'DEA, individually and on behalf of all others similarly situated,<br><br>        Plaintiff,<br><br>   vs.<br><br>PREMIUM BRANDS OPCO LLC, an Ohio Limited Liability Company, and DOES 1-50, inclusive,<br><br>        Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**[DEMAND FOR JURY TRIAL]** |

Plaintiff Deborah O'Dea ("Plaintiff") brings this action individually and on behalf of all others similarly situated, against Defendant Premium Brands Opco LLC ("Defendant"), and states:

## I.    NATURE OF ACTION

1.    Prices reflect a perceived value to consumers.[1] False advertising of prices can be used to manipulate consumers' value perception of products and cause consumers to overpay for them. Aware of the interrelationship between consumers' buying decision processes and price, retailers like Defendant lure consumers with advertised discounts that promise huge savings and high value. But the promised savings are false, and the product's value reflected in its price is incorrect when the retailer advertises discounts from some higher, made-up, and artificially inflated "original" price that no one ever pays.

2.    At all relevant times, Defendant has continually advertised false price discounts for merchandise sold throughout its Ann Taylor Factory Stores and LOFT Outlet stores (hereinafter sometimes referred to collectively as "outlet stores").[2] In bringing this putative class action

---

[1] "[P]rice is materially utilized in the formation of perceptions of the product's value and influences the decision to purchase the product or to continue to search for a lower price." Dhruv Grewal & Larry D. Compeau, *Comparative Price Advertising: Informative or Deceptive?*, 11 J. PUB. POL'Y & MKTG. 52, 55 (Spring 1992); "[R]eference to a retailer's normal or regular price in retail sale price advertising provides the consumer with information used to determine perceived value." Patrick J. Kaufmann, N. Craig Smith, & Gwendolyn K. Ortmeyer, *Deception in Retailer High-Low Pricing: A "Rule of Reason" Approach*, 70 J. RETAILING 115, 118 (1994).

[2] Plaintiff is informed and believes and thereon alleges that both Ann Taylor Factory Stores and LOFT Outlets are outlet stores that are commonly operated by Defendant. Plaintiff is further informed and believes that, based on counsel's investigation (discussed below), that the false discounting scheme is uniform between both stores in terms of how the false reference and sale prices are presented to shoppers. The only difference is the Ann Taylor Factory vs. Loft Outlet brands on the merchandise.

Ann Taylor was founded in 1954 and sold clothing for professional women in its standalone retail stores. In 1998, the Ann Taylor company launched Ann Taylor Loft as a spinoff brand with separate retail stores to cater to younger professional women. In 2009, Ann Taylor Loft was renamed LOFT. Bethany Biron, *The Rise and Fall of Ann Taylor, the Company that Dressed American Career Women for Decades and Ushered in the Era of the 'Power Suit'*, https://www.business

complaint, Plaintiff seeks to remedy this deception and its attendant harm to consumers. Plaintiff seeks monetary damages, restitution, and declaratory and injunctive relief from Defendant arising from its false discounting scheme on women's apparel, accessories, shoes, and other items sold in its Ann Taylor Factory Stores and LOFT Outlet stores.

3.    False reference pricing occurs when a seller fabricates a false "original" price for a product and then offers that product at a substantially lower price under the guise of a discount. The resulting artificial price disparity misleads consumers into believing the product they are buying has a higher market value, and it induces them into purchasing the product. This practice artificially inflates the true market price for these products by raising consumers' internal reference price and in turn the perceived value consumers ascribe to these products (i.e., demand).[3] Consequently, false reference pricing schemes enable retailers, like Defendant, to sell products above their true market price and value, leaving consumers to pay the inflated price regardless of what they thought of the purported discount. Consumers are thus damaged not only by not receiving the promised discount, but by paying a premium the products would not have commanded but for the false reference pricing scheme.

4.    The following example of a hypothetical DVD seller, which parallels Defendant's practice, illustrates how false reference pricing schemes harm consumers: the seller knows it can sell a particular DVD at $5.00, which represents both the market price and the price at which the seller could regularly make a profit. Instead, however, the seller creates a fake "original" price for

insider.com/the-rise-and-fall-of-ann-taylor-photos-history-2020-7 (last accessed June 17, 2024). Both Ann Taylor and LOFT operate outlet stores—Ann Taylor Factory Store and LOFT Outlet, respectively—which are the subject of this Complaint, and not the mainline retail stores.

[3] Dhruv Grewal & Larry D. Compeau, *Comparative Price Advertising: Informative or Deceptive?*, 11 J. Pub. Pol'y & Mktg. 52, 55 (Spring 1992) ("By creating an impression of savings, the presence of a higher reference price enhances subjects' perceived value and willingness to buy the product.").

the DVD of $100.00 and advertises the DVD as "on sale" at 90% off, creating a (fake) "sale" price of $10.00. Consumers purchase the DVD for $10.00, believing they got a "good deal" since it was previously sold—i.e., valued by others in the market—at an "original" price of $100.00, and presumably would be again soon.

5.     The consumer's presumption and purchase stem directly from the seller's deception. If the seller did not employ a false reference pricing scheme, it would not be able to sell many, if any, DVDs at $10.00 because the actual value of the DVD is $5.00. However, the false reference pricing scheme enables the seller to fabricate an increase in consumer demand through the reasonable, but incorrect, perceived value of the DVD ($100.00) in connection with the substantial discount of $90.00. The net effect of myriad consumers' increased willingness to pay $10.00 for the DVD. Thus the seller artificially inflates the market price for the DVD to $10.00 by advertising the false "original" price and corresponding fake discount.

6.     Through its false and misleading marketing, advertising, and pricing scheme alleged herein, Defendant violated, and continues to violate, Oregon and federal law. Specifically, Defendant violated and continues to violate: Oregon's Unlawful Trade Practices Act ("UTPA"), OR. REV. STAT. § 646.605, *et seq.*; and the Federal Trade Commission ("FTC") Act ("FTCA"), which prohibits "unfair or deceptive acts or practices in or affecting commerce" (15 U.S.C. § 45(a)(1)) and false advertisements (15 U.S.C. § 52(a)).

7.     Plaintiff brings this action on behalf of herself and other similarly situated Oregon consumers who have purchased one or more of Defendant's outlet items from Ann Taylor Factory Store and LOFT Outlet that advertised a purported discount from a fictitious higher reference price. Plaintiff seeks to halt the dissemination and perpetuation of this false, misleading, and deceptive pricing scheme, to correct the false and harmful perception it has created in the minds of

consumers, and to obtain redress for those who paid for merchandise tainted by this deceptive pricing scheme. Plaintiff also seeks to enjoin permanently Defendant from engaging in this unlawful conduct. Further, Plaintiff seeks all applicable damages, including actual, benefit of the bargain, statutory, and punitive damages, restitution, reasonable costs and attorney's fees, and other appropriate relief in the amount by which Defendant was unjustly enriched as because of its sell of merchandise offered at a false discount.

## II.    JURISDICTION AND VENUE

8.    This Court has original jurisdiction of this action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The matter in controversy, exclusive of interest and costs, exceeds the sum or value of $5,000,000 and at least some members of the proposed Class (defined below) have a different citizenship from Defendant.

9.    The District of Oregon has personal jurisdiction over Defendant because Defendant Premium Brands Opco LLC is an Ohio limited liability company or other business entity that conducts business in the State of Oregon, and its principal executive offices are located in New York, New York. Defendant conducts sufficient business with sufficient minimum contacts in Oregon, and/or otherwise intentionally avails itself of the Oregon market through the operation of Ann Taylor Factory Stores and LOFT Outlet stores within the State of Oregon.

10.    Venue is proper under 28 U.S.C. § 1391(b)(2) because Defendant transacts substantial business in this District, a substantial part of the events giving rise to Plaintiff's claims arose in this District, and Defendant's misconduct alleged herein occurred in this District.

## III.    GENERAL ALLEGATIONS

### A.    Retailers Benefit from False Reference Pricing Schemes.

11.    Defendant engages in a false and misleading reference price scheme in the marketing and selling of merchandise at its outlet stores.

12.    Retailers, including Defendant, benefit substantially from employing false reference pricing schemes and experience increased sales because consumers use advertised reference prices to make purchase decisions. While the information available to consumers varies for different types of products,[4] consumers usually, as with retail clothing, lack full information about products and, as a result, often use information from sellers to make purchase decisions.[5]

13.    As mentioned above, retailers like Defendant can benefit substantially from false discounting schemes because "framing a price increase as a discount can not only allow the firm to get **higher margins**, but also **increase sales**."[6] This is because consumers use advertised

---

[4] Even within a product, consumers may have imperfect information on the individual attributes. Economists describe "search goods" as those whose attributes "can be ascertained in the search process prior to purchase" (*e.g.*, style of a shirt), "experience goods" as those whose attributes "can be discovered only after purchase as the product is used" (*e.g.*, longevity of a shirt), and "credence goods" as those whose attributes "cannot be evaluated in normal use" (*e.g.*, whether the shirt's cotton was produced using organic farming methods). Michael R. Darby, & Edi Karni, *Free Competition and the Optimal Amount of Fraud*, The J. of L. & Econ. 16, no. 1, (1973) at 67-88.

[5] "Not only do consumers lack full information about the prices of goods, but their information is probably even poorer about the quality variation of products simply because the latter information is more difficult to obtain". Phillip Nelson, *Information and Consumer Behavior*, Journal of Political Economy 78, no. 2, (1970) at 311-29.

[6] Staelin *et al.*, *Competition and the Regulation of Fictitious Pricing*, 87 J. Mktg., 826, 835 (2023) (emphasis added).

reference prices to make purchase decisions, particularly when the information available to consumers is imperfect.[7]

14.    Defendant's deceptive advertised reference prices are thus incorporated into consumers' decision process. First, a product's "price is also used as an indicator of product quality."[8] In other words, consumers view Defendant's deceptive advertised reference prices as a proxy for product quality. Second, reference prices "appeal[] to consumers' desire for bargains or deals."[9] Academic researchers note how consumers "sometimes expend more time and energy to get a discount than seems reasonable given the financial gain involved," and "often derive more satisfaction from finding a sale price than might be expected on the basis of the amount of money they actually save."[10] Under this concept, coined as "transaction utility" by Noble Prize-winning economist Richard Thaler, consumers place value on the psychological experience of obtaining a product at a perceived bargain.[11]

---

[7] Even within a product, consumers may have imperfect information on the individual attributes. Economists describe "search goods" as those whose attributes "can be ascertained in the search process prior to purchase" (e.g., style of a shirt), "experience goods" as those whose attributes "can be discovered only after purchase as the product is used" (e.g., longevity of a shirt), and "credence goods" as those whose attributes "cannot be evaluated in normal use" (e.g., whether the shirt's cotton was produced using organic farming methods). Michael R. Darby & Edi Karni, *Free Competition and the Optimal Amount of Fraud*, J. LAW & ECONOMICS 16, no. 1, (1973) at 67-88, at 68-69.

[8] Grewal, *supra* note 1, at 54; *see also* Richard Thaler, *Mental Accounting and Consumer Choice*, Marketing Science 4, no. 3, (Summer 1985) at 199-214, 212 ("The [reference price] will be more successful as a reference price the less often the good is purchased. The [reference price] is most likely to serve as a proxy for quality when the consumer has trouble determining quality in other ways (such as by inspection)").

[9] Dhruv Grewal & Larry D. Compeau, *Comparative Price Advertising: Informative or Deceptive?* J. of Pub. Pol'y & Mktg. (1992): 52-62, p. 52.

[10] Peter Darke & Darren Dahl, *Fairness and Discounts: The Subjective Value of a Bargain*, J. of Consumer Psych. 13, no 3 (2003): 328-338, p. 328.

[11] "To incorporate … the psychology of buying into the model, two kinds of utility are postulated: *acquisition utility* and *transaction utility*. The former depends on the value of the good received compared to the outlay, the latter depends solely on the perceived merits of the 'deal'". Thaler,

15.    Research in marketing and economics has long recognized that consumer demand can be influenced by "internal" and "external" reference prices.[12] Internal reference prices are "prices stored in memory" (e.g., a consumer's price expectations adapted from past experience) while external reference prices are "provided by observed stimuli in the purchase environment" (e.g., a "suggested retail price," or other comparative sale price).[13] Researchers report that consumer's internal reference prices adjust toward external reference prices when valuing a product.[14] For infrequently purchased products, external reference prices can be particularly influential because these consumers have little or no prior internal reference.[15] In other words, "[t]he deceptive potential of such advertised reference prices are likely to be considerably higher for buyers with less experience or knowledge of the product and product category."[16] Academic

---

Richard, *Mental Accounting and Consumer Choice*, Marketing Science 4, no. 3 (1985): 199-214, p. 205.

[12] Empirical results "suggest that internal reference prices are a significant factor in purchase decisions. The results also add empirical evidence that external reference prices significantly enter the brand-choice decision." Glenn E. Mayhew & Russell S. Winer, *An Empirical Analysis of Internal and External Reference Prices using Scanner Data*, Journal of Consumer Research 19, no. 1 (1992): 62-70, p. 68.

[13] Glenn E. Mayhew & Russell S. Winer, *An Empirical Analysis of Internal and External Reference Prices using Scanner Data*, Journal of Consumer Research 19, no. 1 (1992): 62-70, p. 62.

[14] "Buyers' internal reference prices adapt to the stimuli prices presented in the advertisement. That is, buyers either adjust their internal reference price or accept the advertised reference price to make judgments about the product's value and the value of the deal." Dhruv Grewal et al., *The Effects of Price-Comparison Advertising on Buyers' Perceptions of Acquisition Value, Transaction Value, and Behavioral Intentions*, J. of Mktg. 62 (1998): 46-59, p. 48.

[15] As Thaler notes, "the [suggested retail price] will be more successful as a reference price the less often the good is purchased." Richard Thaler, *Mental Accounting and Consumer Choice*, Marketing Science 4, no. 3 (1985): 199-214, p. 212.

[16] Dhruv Grewal & Larry D. Compeau,. *Pricing and public policy: A research agenda and an overview of the special issue*, J. of Pub. Pol'y & Mktg. 18, no. 1,  (1999 ): 3-10, p. 7.

literature further reports that "there is ample evidence that consumers use reference prices in making brand choices"[17] and publications have summarized the empirical data as follows:

> Inflated reference prices can have multiple effects on consumers. They can increase consumers' value perceptions (transaction value and acquisition value), reduce their search intentions for lower prices, increase their purchase intentions, and reduce their purchase intentions for competing products … Inflated and/or false advertised reference prices enhance consumers' internal reference price estimates and, ultimately, increase their perceptions of value and likelihood to purchase[.][18]

16.     In Staelin, *Regulation of Fictitious Pricing*, published just this year, authors Richard Staelin, a Duke marketing professor since 1982, Joel Urbany, a Notre Dame marketing professor since 1999, and Donald Ngwe, a senior principal economist for Microsoft and former marketing professor for Harvard, built on their prior analytic work to explain the effects of false reference pricing schemes and why their use has not dissipated as previously expected by the FTC, but rather have become more prevalent in the absence of FTC regulation. Importantly, this new study cites and confirms many of the same older consumer studies cited above[19] and notes that the findings of these "older" studies are still widely accepted relevant principles in the economic discipline. *See id.*

---

[17] Kalyanaram, Gurumurthy, and Russell S. Winer. "Empirical Generalizations from Reference Price Research." *Marketing Science* 14, no. 3 (1995): G161-G169, p. G161; *see also* Gotlieb, Jerry B. and Cyndy Thomas Fitzgerald. "An Investigation into the Effects of Advertised Reference Prices on the Price Consumers are Willing to Pay for the Product." *Journal of Applied Business Research* 6, no. 1 (1990): 59-69, at pp. 65-66. ("The results of this research provide support for the position that [external] reference prices are important cues consumers use when making the decision concerning how much they are willing to pay for the product.").

[18] Grewal, Dhruv, and Larry D. Compeau. "Pricing and public policy: A research agenda and an overview of the special issue." *Journal of Public Policy & Marketing* 18, no. 1 (1999): 3-10, p. 7.

[19] *See* Staelin*, Regulation of Fictitious Pricing* (manuscript at 3) ("*It is now well established* that many consumers get extra utility beyond that associated with consuming the product from purchasing it on deal [] and that magnitude of this utility is a function of the size of the deal.") (emphasis added).

17.     Additionally, Staelin, *Regulation of Fictitious Pricing*, explains how the modern development of consumer search behavior and options available to consumers (e.g., smartphones, online shopping) has actually *spread* the presence of fictitious reference pricing, not extinguished it.[20] According to Staelin and his co-authors, "disclosure of the true normal price charged may be the only solution that could plausibly influence both consumer and firm behavior." *Id.* at 826. *See also id.* at 831 ("Identical firms, selling identical products, make positive profits because of their obfuscation strategy, and the likelihood of obfuscation grows as competition intensifies.").

18.     Consequently, retailers, including Defendant, who understand that consumers are susceptible to a bargain, have a substantial financial interest in making consumers think they *are* getting a bargain, even when they are not.  Contrary to the illusory bargains in Defendant's advertisements, consumers are not receiving *any* discount and are actually *overpaying* for Defendant's product because, as Staelin, *et al.* put it, "[t]he magnitude of both real and fake discount[s] were significant predictors of demand above the effects of the actual sales price, ***with fake discounts having a substantially larger effect than real discounts***." *Id.* at 835 (emphasis added).

## B.     Defendant Engages in a Fraudulent Price Discounting Scheme

19.     Defendant is a specialty retailer of women's apparel, accessories, shoes, and jewelry items. For years, Defendant has continually engaged in a fake discounting scheme that harms consumers by advertising its Ann Taylor Factory Store and Loft Outlet merchandise at discounted "sale" prices. In short, Defendant markets the "sale" prices as discounts from the original or "Ticketed Prices" listed on the products' price tags. In most cases, the items are each

---

[20] Staelin, *et al*., *supra*, at 826. (explaining how the study "develop(s) a descriptive model explaining why fictitious reference pricing has spread instead of being extinguished by competition.").

accompanied by a placard sign immediately above them[21] advertising a "__% Off." In other instances, the sale placards advertise a whole-price discount that is usually substantially less than the "original" price tag price. At Loft Outlets, the discount placard signs are printed on white card stock with bold, red lettering advertising the fake discount, as shown in the below photos:[22]



---

[21] In other cases, such as with table displays, the discount sign applies to several, typically similar, items.

[22] The red dress shown in this photo is identical to the item that Plaintiff purchased, discussed in ¶ 33.



20.    At Ann Taylor Factory Stores, the discount placard signs are printed on black or red card stock with white lettering, as shown below: [23]

---

[23] *See also* **Exhibit A**, Ann Taylor Factory Store and LOFT Outlet in-store photographs depicting the extent and pervasiveness of Defendant's pricing scheme.





21.     As shown in the above photos—and throughout **Exhibit A**—Defendant's "original" (or "ticket") prices are unaccompanied by any qualifying language that could arguably direct consumers to compare Defendant's reference price and purported discount to any other market outside of the particular factory store where it is being advertised. This reasonably impression is reinforced by Defendant's pervasive use of "__% OFF" advertisements, which denote limited time discounts from *former* prices.[24] Thus, Defendant does not advertise any "discounts" from any other stores, including its own Ann Taylor and/or LOFT mainline stores.

22.     Moreover, Defendant's Ann Taylor Factory Stores and LOFT Outlet stores sell exclusive, factory-branded "made-for-outlet" merchandise not available anywhere else.[25] Thus, there is no other market for these products outside of Defendant's Ann Taylor Factory Outlet and LOFT Outlet stores for the simple fact that that is the only place they are sold. Plaintiff is informed and believes and thereon alleges that all made-for-outlet Ann Taylor Factory Store merchandise can be differentiated from mainline retail Ann Taylor merchandise by the inclusion of the word "Factory" on its labels and/or price tags. Likewise, LOFT Outlet merchandise can be differentiated from mainline retail LOFT merchandise by the inclusion of the word "Outlet" on its labels and/or

---

[24] *See Vizcarra v. Michaels Stores, Inc.*, No. 23-cv-00468-PCP, __ F. Supp. 3d __, 2024 WL 64747, at *4 (N.D. Cal. Jan. 5, 2024) ("A reasonable consumer does not need language such as, 'Formerly $9.99, Now 40% Off $9.99,' or '40% Off the Former Price of $9.99,' to reasonably understand '40% off' to mean 40% off the former price of the product.") (quoting *Knapp v. Art.com, Inc.*, No. 16-CV-00768-WHO, 2016 WL 3268995, at *4 (N.D. Cal. June 15, 2016)).

[25] *See Sperling v. Stein Mart, Inc.*, 291 F. Supp. 3d 1076, 1084 (C.D. Cal. 2018) ("In exclusive product cases, a store, often an outlet store, sells a lower-price, different version of a product sold in a traditional retail store. The outlet uses the price of the product made for the retail store as a comparative reference price on price tags. However, the actual product being sold in the outlet is made exclusively for the outlet and is never sold for the comparative reference price at a traditional retail store. In those cases, courts generally find that a plaintiff can proceed with his or her claims."); *see, e.g.*, *Rubenstein v. Neiman Marcus Grp. LLC*, 687 F.App'x 564, 567 (9th Cir. 2017); *Stathakos v. Columbia Sportswear Co.*, No. 15-cv-04543-YGR, 2017 WL 1957063, at *8 (N.D. Cal. May 11, 2017); *Branca v. Nordstrom, Inc.*, No. 14cv2062-MMA, 2015 WL 10436858, at *7–8 (S.D. Cal. Oct. 9, 2015).

price tags. Plaintiff is informed and believes and thereon alleges that Ann Taylor Factory Stores and LOFT Outlets carry all—if not virtually all—made-for-outlet merchandise. Thus, Defendant is not offering a "discount" from its own or any competitor's mainline retail merchandise offered in the relevant market (or *any* market).

23.    Even if Defendant did sometimes offer its Ann Taylor Factory or LOFT Outlet products at their full reference price (which it does not), that offering would do little to legitimize Defendant's practice. This is because, for the advertised former price to be "actual, bona fide" and "legitimate" it must be the "price at which the article was offered to the public **on a regular basis for a reasonably substantial period of time**." 16 C.F.R. § 233.1(a) (emphasis added). Here, the advertised reference prices on Defendant's Ann Taylor Factory Store and LOFT Outlet merchandise are *not* the price at which Defendant regularly (or ever) sells, or expects to regularly sell, the merchandise; they are merely a basis for misleading consumers into believing they are receiving a substantial discount.

24.    In sum, Defendants' fake discount scheme is intended to (and does) increase Defendant's sales while depriving consumers of the benefit of their bargain and causing them to spend more money than the Factory Store items are actually worth—the price they could command in the absence of the fake discount.[26] This conduct deprives consumers of a fair opportunity to fully evaluate the offers and to make purchase decisions based on accurate information and results in the illegal imposition of a price premium the Factory store merchandise could not and would not otherwise command, which consumers, like Plaintiff, are duped into paying.

---

[26] Staelin *et al.*, *supra* note 6, at 826 ("It is now well accepted that many consumers get extra utility, beyond that associated with consuming a product, from purchasing it on deal [] and that the magnitude of this utility is a function of the size of the deal.").

**C.     Defendant's Fraudulent Price Discounting Scheme Harms All Consumers**

25.     A product's reference price matters to consumers because it serves as a baseline upon which consumers perceive a product's value.[27] Empirical studies "suggest that consumers are likely to be misled into a willingness to pay a higher price for a product simply because the product has a higher reference price."[28] Consumers are misled and incorrectly overvalue Defendant's Ann Taylor Factory Store and LOFT Outlet products as a result of the false price comparisons. The products' actual sales prices, therefore, reflect consumers' overvaluation of them, which in turn permits Defendant to command inflated prices for them beyond what the market would otherwise allow. As discussed above, academic researchers have documented the relationship between reference prices and consumer behavior, as well as the resulting harm from *false* reference prices:

> [A]dvertised reference prices in these deal-oriented advertisements can enhance buyers' internal reference prices . . . . These enhanced internal reference prices, when compared with the lower selling price, result in higher transaction value perceptions. The increase in perceived transaction value enhances purchases and reduces search behavior for lower prices. If sellers intentionally increase the advertised reference prices above normal retail prices, this is, inflate advertised reference prices, the resulting inflated perceptions of transaction value would be deceptive. Harm to both buyers and competitors could result from the effect of the inflated transaction value on buyers' search and purchase behaviors.[29]

---

[27] Thaler, Richard, "Mental Accounting and Consumer Choice," *Marketing Science* 4, no. 3 (1985): 199-214, at p. 212.

[28] Gotlieb, Jerry B. and Cyndy Thomas Fitzgerald. "An Investigation into the Effects of Advertised Reference Prices on the Price Consumers are Willing to Pay for the Product." *Journal of Applied Business Research* 6, no. 1 (1990): 59-69, at p. 66. Moreover, "if a higher reference price encourages consumers to pay a higher price for a product than the consumer was willing to pay for the identical product with a lower reference price, then the practice of using high reference prices would be deceptive." *Id*. at p. 60.

[29] Grewal, Dhruv, Kent B. Monroe, and Ramayya Krishnan. "The Effects of Price-Comparison Advertising on Buyers' Perceptions of Acquisition Value, Transaction Value, and Behavioral Intentions." *The Journal of Marketing* 62 (1998): 46-59, at p.46.

26.     Accordingly, all consumers who purchase Ann Taylor Factory Store and LOFT Outlet merchandise are harmed by Defendant's pricing scheme because its impact pervades the entire market for Ann Taylor Factory Store and LOFT Outlet merchandise. This is because, again, the artificially increased demand generated by Defendant's pricing scheme results in increased actual sales prices beyond what the products would command in the absence of the false reference pricing scheme. Again, "the higher reference price stated alongside the selling price shift[s] the demand function outward, leading to higher average prices and thus higher margins."[30] All Ann Taylor Factory Store and LOFT Outlet shoppers therefore pay more regardless of their individual beliefs or purchasing decision processes. In other words, their subjective beliefs about the value of the products or the legitimacy of the purported discounts are inconsequential to the injury they incur when purchasing Defendant's Ann Taylor Factory Store and LOFT Outlet merchandise. All consumers who purchase falsely discounted Ann Taylor Factory Store and LOFT Outlet products have overpaid and are deprived of the benefit of the bargain (i.e., the promised discount). Additionally, they will have paid a premium for merchandise that is worth less than its actual sales price.

27.     To put it differently, the fake discount information presented by Defendant's false advertised reference and sale prices first causes consumers to (reasonably) perceive they are receiving a bargain when the merchandise is purchased at its "sale" price. This consumer perception results in these consumers gaining an additional "transaction value"[31] on their outlet

---

[30] Staelin *supra* note 6, at 835.

[31] Thaler, Richard. *Mental Accounting and Consumer Choice.* MKTG SCI. 4, no. 3 (1985): 199-214, at 205 ("To incorporate … the psychology of buying into the model, two kinds of utility are postulated: acquisition utility and transaction utility. The former depends on the value of the good received compared to the outlay, the latter depends solely on the perceived merits of the 'deal'."); Dhruv Grewal & Larry D. Compeau, *Comparative Price Advertising: Informative or Deceptive?*,

purchases, which they would not have otherwise gained but for Defendant's fake discounting scheme. Consumers' valuation of Ann Taylor Factory Store and LOFT Outlet merchandise therefore increases in the aggregate.

28.     Fundamental economics concepts and principles dictate that the harm caused by Defendant's scheme is uniformly suffered by deceived and, to the extent there are any, non-deceived outlet shoppers alike. One such principle is that cost and demand conditions determine market prices paid by all consumers.[32] The aggregate demand curve for a product, including Defendant's, represents consumers' valuation of the product as a whole; as consumers' valuation increases, the demand curve shifts outward. When the aggregate demand curve of a product shifts outward, its market price will increase. Therefore, a specific individual's willingness to pay a certain price for a product will not negate how market prices, as determined by aggregate demand, dictate what all consumers purchasing a given product will pay.

29.     As a result, Defendant's pricing scheme impacts the market prices of its Ann Taylor Factory Store and LOFT Outlet products, and any one individual consumer's subjective beliefs or idiosyncratic rationales will not isolate them from the resultant artificial and illegitimate inflation in Ann Taylor Factory Store and LOFT Outlet prices. Economic theory ensures that as the aggregate demand curve for the products moves outward, all consumers are forced to pay a higher

---

11 J. PUB. POL'Y & MKTG. 52, 55 (Spring 1992) ("By creating an impression of savings, the presence of a higher reference price enhances subjects' perceived value and willingness to buy the product."); Dhruv Grewal, & Larry D. Compeau. *Pricing and public policy: A research agenda and an overview of the special issue*. J. PUB. POL'Y & MKTG 18, no. 1 (1999): 3-10, at 7.

32 "[P]rice and quantity are determined by all buyers and sellers as they interact in the marketplace." N. Gregory Mankiw, *Essentials of Economics.* Eighth Edition. Boston, MA: Cengage Learning, 2015, at p. 66). *See also* Hal R. Varian, *Microeconomics Analysis* 23-38, 144-157, 233-353, and 285-312 (W.W. Norton & Company, 3rd ed. 1992).

price than the products would command absent the fake discounting scheme. Plaintiff and proposed Class members thus suffered a common impact from Defendant's misconduct.

**D.    Investigation**

30.    Plaintiff's counsel has conducted a large-scale, comprehensive investigation into the Defendant's pricing practices in its Ann Taylor Factory Store and Loft Outlet. Plaintiff's counsel first tracked items in Defendant's outlet stores beginning in October of 2021 and concluding in September of 2022 in California, New Jersey, and New York. Plaintiff's counsel first monitored products at Defendant's Oregon Ann Taylor Factory Store and LOFT Outlets in March of 2022, and established an investigation there in September of 2023, which is ongoing to present and includes the Columbia Gorge Outlets where Plaintiff's purchase was made. Attached as **Exhibit B** is a list of exemplar products from the September 2023–present investigation.

31.    Notably, Defendant's outlet pricing scheme (i.e., the manner in which the reference prices and purported discounts are conveyed to shoppers) has appeared uniform at every location, regardless of what state it is in or when the observation was made.  The only thing that changed was the advertised discount and/or reference price on certain merchandise. Indeed, all products observed appear to have remained "on sale" throughout the investigation, "discounted" against a false reference price that has never been observed as the actual selling price. In other words, all items had price tags that were then perpetually "discounted" by in-store signage indicating a large percentage off ("__% Off") or whole-price reduction discount. Accordingly, Plaintiff is informed and believes and thereon alleges that Ann Taylor Factory Store and LOFT Outlet merchandise is never offered for sale at its full "original" price—and certainly not "on a regular basis for a reasonably substantial period of time," as required by 16 C.F.R. § 233.1.

32.     Thus, the investigation confirms that the "original" or "price tag" reference price of the item Plaintiff purchased was never the actual selling price of that item because it was never offered at that price, but rather continuously offered for sale at fake discount prices. The investigation confirmed that this was a pervasive practice at the Defendant's Ann Taylor Factory Store and LOFT Outlet stores,[33] as thousands of items remained continuously discounted throughout the investigation period, including those products purchased by Plaintiff.[34]

---

[33] Numerous false discount pricing cases brought in California federal district courts have held that, notwithstanding [FRCP] Rule 9(b) (not applicable here), that plaintiffs are **not** required to perform or provide **any** specific details pertaining of pre-lawsuit investigations into false discounting practices in order to defeat a motion to dismiss. *See, e.g., Rubenstein*, 687 F.App'x at 568 ("Without an opportunity to conduct any discovery, Rubenstein cannot reasonably be expected to have detailed personal knowledge of Neiman Marcus's internal pricing policies or procedures for its Last Call stores. Because Rubenstein need not specifically plead facts to which she cannot 'reasonably be expected to have access,' her allegations regarding the fictitious nature of the Compared To prices may properly be based on personal information and belief at this stage of the litigation."); *Stathakos*, 2016 WL 1730001, at *3–4 (complaint lacking in any allegations related to pre-suit investigation of false discounting practice satisfied Rule 9(b); *Knapp v. Art.com, Inc.*, No. 16-CV-00768-WHO, 2016 WL 3268995, at *4 (N.D. Cal. June 15, 2016) (allegations of "perpetual sale" were alone sufficient); *Horosny*, 2015 WL 12532178, at *4 (denying motion to dismiss where plaintiff pled existence of deceptive pricing scheme "on information and belief" only, without investigation); *see also Le v. Kohls Dept. Stores, Inc.*, 160 F.Supp.3d 1096, 1099 (E.D. Wis. Feb. 8, 2016) (denying a motion to dismiss where the plaintiff had not conducted a nationwide pre-suit investigation before alleging the defendant's comparison prices did not reflect a price at which its merchandise was routinely sold). Still, complaints containing pre-suit investigation allegations similar to Plaintiffs' here have routinely been sustained over motion to dismiss challenges, in California federal courts as well as state courts which notably *do not* apply Federal Rule 9(b)'s heightened pleading standard for actions sounding in fraud. *See, e.g., Adams v. Cole Haan, LLC*, No. 8:20-CV-00913-JWH-DFMx, 2021 WL 4907248 (C.D. Cal. Mar. 1, 2021); *Dahlin v. Under Armour, Inc.*, No. CV 20-3706 PA (JEMx), 2020 WL 6647733 (C.D. Cal. July 31, 2020); *Inga*, 2020 WL 5769080, at *1; *Harris v. PFI W. Stores, Inc.*, No. SACV 19-2521 JVS (ADSx), 2020 WL 3965022, at *1 (C.D. Cal. Apr. 9, 2020); *Calderon v. Kate Spade & Co., LLC*, No. 3:19-CV-00674-AJB-JLB, 2020 WL 1062930 (S.D. Cal. Mar. 5, 2020); *Fisher v. Eddie Bauer LLC*, No. 19-cv-857 JM (WVG) 2020 WL 4218228 (S.D. Cal. Feb. 3, 2020); *Dennis v. Ralph Lauren Corp.*, No. 16-cv-1056-WQH-BGS, 2017 WL 3732103 (S.D. Cal. Aug. 29, 2017); *Rael v. New York & Co., Inc.*, No. 16-CV-369-BAS (JMA), 2017 WL 3021019 (S.D. Cal. July 17, 2017); *Azimpour v. Sears, et al.*, No. 15-CV-2798 JLS (WVG), 2017 WL 1496255 (S.D. Cal. Apr. 26, 2017); *Fallenstein v. PVH Corp., et al.*, No. 21-CV-01690-AJB-AGS (S.D. Cal. Jan. 3, 2023) at ECF No. 29 (Order Denying Defendants' Motion to Dismiss Plaintiff's First Amended Complaint).

33.     Despite Plaintiff's counsel's best efforts at investigation, the full extent of Defendant's false and deceptive pricing scheme can only be revealed through a full examination of records exclusively in the possession of Defendant.

## IV.    PARTIES

**Plaintiff**

34.     Deborah O'Dea resides in Portland, Oregon. On November 5, 2023, Plaintiff went shopping for some new clothes at the LOFT Outlet store located at the Columbia Gorge Outlets, 450 NW 257th Way, Troutdale, Oregon 97060 (the "Columbia Gorge Outlets"). In reliance on Defendant's false and deceptive advertising, marketing, and discount pricing scheme, Plaintiff purchased the following item from the Columbia Gorge Outlet on November 5, 2023:

| No. | Item: | Store: | False Reference Price: | Purchase Price: |
|-----|-------|--------|------------------------|-----------------|
| 1.  | L Dress 35355397 | Loft Outlet | $84.99 | $63.74 (25% Off) |

35.     During her time at the outlet store on November 5, 2023, Plaintiff browsed several items before deciding on what item to purchase. After reviewing the advertised sale price for the item listed above, Plaintiff decided to purchase the above listed item.

36.     Indeed, after observing the original price of the item and the accompanying sale price, Plaintiff reasonably believed she was receiving a significant discount on the dress. Her belief that the discounted price on the item was limited and would not last was material and integral to her purchase decision. She would not have made the purchase were it not for the significant bargain she thought she was receiving. However, Plaintiff did not receive the benefit of her bargain.

37.     Plaintiff has therefore suffered a loss as a direct result of Defendant's unlawful, unfair, and fraudulent false reference pricing scheme.

**Plaintiff's Monetary Injury**

38.    Plaintiff has incurred quantifiable monetary injury as a result of Defendant's fraudulent pricing scheme. Plaintiff overpaid for the dress she purchased, and it was Defendant's false reference pricing scheme and attendant deception that caused Plaintiff to overpay. Plaintiff was induced to purchase the dress based on the belief that she was buying it at a discount and thus that its value was significantly greater than the sale price she paid for it. However, she did not receive the benefit of the bargain she reasonably believed she was getting and, in reality, overpaid for the dress as a result of the fraudulent reference pricing scheme.

39.    That is, the item Plaintiff purchased was worth *less* than the amount she paid for it. If Defendant had not employed the falsely advertised "original" price for the item, then that item would not have commanded the higher, inflated price that Plaintiff paid. paid. Accordingly, Plaintiff and Class members paid a *price premium* on Defendant's outlet merchandise as a direct result of Defendant's misconduct.

40.    This price premium arises due to the Defendant's unlawful and deceptive increase of reference prices, which increases consumer demand and prices paid by consumers. The previously discussed academic literature credibly ties increased reference prices to increased consumer demand, and Plaintiff will prove at trial (and through her experts) that Class members paid a price premium in this case.

41.    There are several methodologies that courts have accepted in order to tie a false advertising misconduct to Class members' price premium harm (e.g., regression analysis and conjoint analysis), all of which are available here.

42.    For the sake of illustrating the objectively measurable and quantifiable nature of Plaintiff's injury—the overpayment or *price premium*—attributable to Defendant's deception,

following discovery on Defendant's historic pricing data, Plaintiff herein alleges the general mechanics of the regression model she intends to seek to set forth a at trial and/or Class certification. To start, the difference between the actual selling price paid by Plaintiff due to the artificially increased demand for the products—caused by Defendant's false pricing scheme—and the market selling price that the products would have commanded without Defendant's deception provides an objective measure by which Plaintiff was overcharged and injured by Defendant. In other words, this price premium for the LOFT Outlet merchandise Plaintiff purchased, which was caused by Defendant's deception, provides a measurement of how much Plaintiff overpaid. Among other methodologies (e.g., conjoint analysis and economic market simulations), this amount can be quantified with hedonic regression employing Defendant's historic pricing data. Once performed, this analysis will likely yield a positive correlation between the reference price and the price actually paid for the products.

43.    More specifically, with the assistance of a qualified economist, Plaintiff can analyze Defendant's product SKUs and their pricing practices attached to each SKU. Then, through the use of a sophisticated yet straightforward regression analysis, the economist will quantify the amount Plaintiff overpaid. That process will involve calculating Defendant's average selling price, average reference price, and the delta between the two. This data, along with other product attributes (i.e., control variables, such as, e.g., pants vs shorts vs leggings, etc.) can be used to determine one or more coefficient(s) (depending on which/how many control variables are used), which can then be applied on a per item basis to determine the item's overcharge. This coefficient

represents the statistical estimate of the relationship between a product's selling price and reference price.[35]

44.    The estimated overcharge (injury) can then be calculated by multiplying the coefficient determined by the regression with the amount of misconduct (i.e., the amount by which false reference prices are unlawfully inflated beyond the actual sales price) on a per product basis.[36] This exercise can also be performed, more simply, by first determining the Defendant's *average* amount by which Defendant's reference prices exceed its actually actual sales prices, either for a group of similar products or storewide.

45.    Accordingly, objective measures exist to readily demonstrate that Plaintiff and Class members overpaid for the falsely discounted Ann Taylor Factory and LOFT Outlet merchandise they purchased during the class period.

### **Plaintiff Does *Not* Have an Adequate Remedy at Law**

46.    Plaintiff does not have an adequate remedy at law, and is susceptible to this harm reoccurring because she cannot be certain that Defendant will have corrected its deceptive pricing scheme and, assuming she can determine whether she is purchasing merchandise at a true bargain, she desires to shop at Defendant's outlet stores (both Ann Taylor Factory Store and LOFT Outlet) in the future because she likes the style and brand of the merchandise, and because they offer new clothing items during different seasons.

---

[35] That is, the coefficient functions as the incremental increase in actual sales price for every $1 increase in the reference price. (For example, a coefficient of .25 would mean for every $1 increase in reference price, the actual selling price would be expected to increase by $0.25.)

[36] Defendant should have these records in its historical pricing and sales data, but even if it does not the exercise can still be adequately performed by using current, publicly available information on Defendant's reference prices and selling prices as a proxy for the missing data.

47.    Due to the enormous, fluctuating variety of styles and sizes of merchandise offered at the Ann Taylor Factory Store and LOFT Outlet stores, Plaintiff will be unable to parse what prices are inflated and untrue, and what prices, if any, are not. Without an injunction enjoining Defendant's false pricing scheme, she cannot trust that Defendant will label and/or advertise its outlet merchandise truthfully and in a non-misleading fashion in compliance with applicable law. Plaintiff simply does not have the resources to ensure that Defendant is complying with Oregon and federal law with respect to its pricing, labeling, and/or advertising of its outlet merchandise. An injunction is the only form of relief which will guarantee Plaintiff and other consumers the appropriate assurances.

48.    Further, because of the wide selection of merchandise available at Defendant's Ann Taylor Factory and LOFT Outlet stores, the sheer volume of products involved in Defendant's deceit (i.e., virtually all of them), and the likelihood that Defendant may yet develop and market additional outlet merchandise items for sale in outlet stores, Plaintiff may again, by mistake, purchase a falsely discounted product at one of the Defendant's outlet stores under the reasonable, but false, impression that the advertised reference price represented a *bona fide* former price at which the item was previously offered for sale by Defendant. However, without substantial, time-consuming, and costly investigation, Plaintiff will have no way of knowing whether Defendant has deceived them again.

49.    Absent an equitable injunction enjoining Defendant from continuing in the unlawful course of conduct alleged herein, Plaintiff, members of the Class, and the general public will be harmed irreparably and denied an effective and complete remedy because they face a real and tangible threat of future harm emanating from Defendant's ongoing and deceptive conduct that cannot be remedied with monetary damages. Accordingly, Plaintiff, members of the Class,

and the public lack an adequate remedy at law, and an injunction will guarantee Plaintiff and other consumers the appropriate protection from deceptive practices.

**<u>Defendant</u>**

50.    Plaintiff is informed and believes, and upon such information and belief alleges, Defendant Premium Brands Opco LLC is an Ohio limited liability company with its principal executive offices in New York, New York. Plaintiff is informed and believes that Premium Brands Opco LLC operates Ann Taylor Factory Store and LOFT Outlet stores in Oregon and elsewhere across the United States, and advertises, markets, distributes, and/or sells clothing and accessories in Oregon and throughout the United States.

51.    Plaintiff does not know the true names or capacities of the persons or entities sued herein as Does 1-50, inclusive, and therefore sues such defendants by such fictitious names. Plaintiff is informed and believes, and upon such information and belief alleges, that each of the Doe defendants is, in some manner, legally responsible for the damages suffered by Plaintiff and members of the proposed Class as alleged herein. Plaintiff will amend this Complaint to set forth the true names and capacities of these defendants when they have been ascertained, along with appropriate charging allegations, as may be necessary.

52.    Defendant knows that its reference price advertising is false, deceptive, misleading, unconscionable, and unlawful under Oregon and federal law.

53.    Defendant fraudulently concealed from and intentionally failed to disclose to Plaintiff and other members of the proposed Class the truth about its advertised discount prices and former reference prices. Defendant concealed from consumers the true nature and quality of the products sold at its outlet stores.

54.    Defendant intentionally concealed and failed to disclose material facts regarding the truth about false former price advertising in order to provoke Plaintiff and the proposed Class to purchase Ann Taylor Factory Store and LOFT Outlet products in its outlet stores.

55.    At all relevant times, Defendant has been under a duty to Plaintiff and the Class to disclose the truth about its false discounts.

### IV.    CLASS ALLEGATIONS

56.    Plaintiff brings this action on behalf of themselves and all other similarly situated Class members pursuant to Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure and seek certification of the following Class against Defendant:

> All persons, within the State of Oregon, who, within the applicable statute of limitations preceding the filing of this action (the "Class Period"), purchased from an Ann Taylor Factory Store or LOFT Outlet one or more products at discounts from an advertised reference price and who have not received a refund or credit for their purchase(s).

Excluded from the Class are Defendant, as well as its officers, employees, agents or affiliates, parent companies and/or subsidiaries, and each of their respective officers, employees, agents or affiliates, and any judge who presides over this action. Plaintiff reserves the right to expand, limit, modify, or amend this Class definition, including the addition of one or more classes, in connection with her motion for Class certification, or at any other time, based upon, *inter alia*, changing circumstances and/or new facts obtained during discovery.

57.    ***Numerosity***: The Class members are so numerous that joinder of all members is impracticable. Plaintiff is informed and believes that the proposed Class contains hundreds of thousands of individuals who have been damaged by Defendant's conduct as alleged herein. The precise number of Class members is unknown to Plaintiff.

58.    ***Existence and Predominance of Common Questions of Law and Fact***: This action involves common questions of law and fact, which predominate over any questions affecting

individual Class members. These common legal and factual questions include, but are not limited to, the following:

a.    whether, during the Class Period, Defendant used advertised false reference prices on its Ann Taylor Factory Store and/or LOFT Outlet product labels and advertised false price discounts on merchandise sold in its factory outlet stores;

b.    whether Defendant ever offered items for sale or sold items at their advertised reference price;

c.    whether, during the Class Period, any of the original prices advertised by Defendant were false and/or misleading;

d.    whether Defendant's purported sale prices advertised in its outlet stores reflected any actual discounts or savings;

e.    whether Defendant's purported percentage-off discounts advertised in its outlet stores reflected any actual discounts or savings;

f.    whether Defendant's alleged conduct constitutes violations of the laws asserted;

g.    whether Defendant's misconduct alleged herein was intentional;

h.    whether Defendant engaged in an unconscionable commercial practice, and/or employed deception or misrepresentation under the laws asserted;

i.    whether Plaintiff and Class members are entitled to damages and the proper measure of that loss; and

j.    whether an injunction is necessary to prevent Defendant from continuing to use false, misleading, and/or illegal price comparisons.

59.    **Typicality**: Plaintiff's claims are typical of the claims of the Class members because, *inter alia*, all Class members have been deceived (or were likely to be deceived) by Defendant's false and deceptive price advertising scheme, as alleged herein. Plaintiff is advancing the same claims and legal theories on behalf of herself and all Class members.

60.    **Adequacy**: Plaintiff will fairly and adequately protect the interests of the Class members. Plaintiff has retained counsel experienced in complex consumer class action litigation, and Plaintiff intends to prosecute this action vigorously. Plaintiff has no antagonistic or adverse interest to those of the Class.

61.    **Superiority**: The nature of this action and the nature of laws available to Plaintiff and the Class make the use of the class action format a particularly efficient and appropriate procedure to afford relief to them and the Class for the wrongs alleged. The damages or other financial detriment suffered by individual Class members is relatively modest compared to the burden and expense that would be entailed by individual litigation of their claims against Defendant. It would thus be virtually impossible for Plaintiff and Class members, on an individual basis, to obtain effective redress for the wrongs done to them. Absent the class action, Class members and the general public would not likely recover, or would not likely have the chance to recover, damages or restitution, and Defendant will be permitted to retain the proceeds of its fraudulent and deceptive misdeeds.

62.    All Class members, including Plaintiff, were exposed to one or more of Defendant's misrepresentations and/or omissions of material fact in connection with its false reference pricing and discounting scheme. Due to the scope and extent of Defendant's consistent false sale prices, advertising scheme, disseminated in a years-long campaign to Oregon consumers, it can be reasonably inferred that such misrepresentations and/or omissions of material fact were uniformly

made to all members of the Class. In addition, it can be reasonably presumed that all Class members, including Plaintiff, affirmatively acted in response to these misrepresentations and these omissions of material facts implicit in Defendant's false reference pricing and discounting scheme when purchasing merchandise sold at Ann Taylor Factory Store and LOFT Outlet stores.

63.    Plaintiff is informed that Defendant keeps extensive computerized records of its Ann Taylor Factory Store and LOFT Outlet customers through, *inter alia*, customer loyalty programs and general marketing programs. Defendant has one or more databases through which a significant majority of Class members may be identified and ascertained, and Defendant maintains contact information, including email and home addresses, through which notice of this action could be disseminated in accordance with due process requirements.

## V.    CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

### Violation of Oregon's Unlawful Trade Practices Act ("UTPA") OR. REV. STAT. § 646.605, *et seq.*

64.    Plaintiff repeats and re-alleges the allegations contained in every preceding paragraph as if fully set forth herein.

65.    Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant for violations of the UTPA, ORS § 646.605 *et seq*.

66.    The UTPA is Oregon's principal consumer protection statute. As the Supreme Court of Oregon has explained:

> The civil action authorized by ORS 646.638 is designed to encourage private enforcement of the prescribed standards of trade and commerce in aid of the act's public policies as much as to provide relief to the injured party. This is apparent from the section itself. It allows recovery of actual damages or $200, whichever is greater, plus punitive damages, costs, and attorney fees. . . . The evident purpose is to encourage private actions when the financial injury is too small to justify the expense of an ordinary lawsuit . . . . the legislature was concerned as much with devising sanctions for the prescribed standards of trade and commerce as with

remedying private losses, and that such losses therefore should be viewed broadly. The private loss indeed may be so small that the common law likely would reject it as grounds for relief, yet it will support an action under the statute.

*Weigel v. Ron Tonkin Chevrolet Co.*, 298 Or. 127, 134–36, 690 P.2d 488 (1984). A private plaintiff

may also seek an injunction "as may be necessary to ensure cessation of unlawful trade practices."

ORS § 646.636.

67.     Defendant is a "person," as defined by ORS § 646.605(4). Defendant is engaged in

"trade" and "commerce" in Oregon by offering for sale goods with reference prices and discounts

that directly or indirectly affect the people of Oregon, as defined by ORS § 646.605(8). The outlet

products advertised by Defendant with reference prices and discounts are "goods" that are or may

be obtained primarily for personal, family or household purposes, as defined by ORS § 646.605(6).

Defendant's representations of reference prices and discounts in its outlet stores are

"advertisements" as defined by ORS § 646.881(1). Defendant's use of reference prices and

advertised discounts are "price comparisons" as defined by ORS § 646.881(2).

68.     Plaintiff and the Class members purchased the goods advertised by Defendant with

reference prices and discounts for personal, family or household purposes.

69.     The unlawful methods, acts and practices pled herein were committed in the course

of Defendant's business. ORS § 646.608(1).

70.     Defendant's unlawful methods, acts and practices pled herein were "willful

violations" of ORS § 646.608 because Defendant knew or should have known that its conduct was

a violation, as defined by ORS § 646.605(10).

71.     Defendant's reference prices are representations of Defendant's own "former

prices," as defined by ORS § 646.885.

72.     Defendant's    methods,    acts    and    practices,    including    Defendant's
misrepresentations, active concealment and failures to disclose, violated and continue to violate
the UTPA in ways including, but not limited to, the following:

i.      Defendant represented its goods had characteristics or qualities that the
goods did not have (specifically, Defendant represented that the goods had a value equal
to the reference price, when in fact they did not and instead had a much lower true value)
(ORS § 646.608(1)(e));

ii.     Defendant advertised its goods with intent not to provide the goods as
advertised (specifically, Defendant represented that the goods had a value equal to the
reference price, when in fact they did not and instead had a much lower true value—even
lower than the "discounted" actual sales price) (ORS § 646.608(1)(i));

iii.    Defendant made false or misleading representations of fact concerning the
reasons for, existence of, or amounts of price reductions (ORS § 646.608(1)(j));

iv.     Defendant engaged in price comparison advertising in violation of ORS
§ 646.883(2) by failing to comply with ORS § 646.608(1)(j) and ORS § 646.608(4) (ORS
§ 646.608(1)(ee));

v.      Defendant engaged in price comparison advertising in violation of ORS
§ 646.885(2) by using terms such as "____ percent discount," "$____ discount," "____
percent off" and/or "$____ off" where the reference price was not in fact Defendant's own
former price (ORS § 646.608(1)(ee)); and

vi.     Defendant engaged in other unfair or deceptive conduct in trade or
commerce, as described herein (ORS § 646.608(1)(u); ORS § 646.608(4)).

73.     With respect to omissions, Defendant at all relevant times had a duty to disclose the information in question because, inter alia: (a) Defendant had exclusive knowledge of material information that was not known to Plaintiff and the Class; (b) Defendant concealed material information from Plaintiff and the Class; and/or (c) Defendant made partial representations which were false and misleading absent the omitted information.

74.     Defendant's misrepresentations and nondisclosures deceive and tend to deceive a reasonable consumer and the general public.

75.     Defendant's misrepresentations and nondisclosures are material, in that a reasonable person would attach importance to the information and would be induced to act on the information in making purchase decisions.

76.     Defendant engaged in the reckless or knowing use or employment of the unlawful methods, acts or practices alleged herein which have been declared unlawful by ORS § 646.608.

77.     As a direct, substantial and/or proximate result of Defendant's conduct, Plaintiff and the Class members suffered compensable and ascertainable losses.

78.     Plaintiff and the Class members would not have purchased the products at the prices they paid if they had known that the advertised reference prices and discounts were false.

79.     Defendant's false reference pricing scheme fraudulently increased demand from consumers. This fraud artificially raised consumer demand for Defendant's outlet merchandise, thereby shifting the demand curve outward and enabled Defendant to charge higher prices than it otherwise could have charged.

80.     The products that Plaintiff and Class members purchased were not, in fact, worth as much as Defendant represented them to be worth, or the actual sales price that Plaintiff and Class members paid for them.

81.    Plaintiff seeks, on behalf of herself and the Class: (1) the greater of statutory damages of $200 or actual damages for every violation of the act; (2) punitive damages; (3) appropriate equitable relief, including injunctive and restitution, as appropriate; and (4) attorneys' fees and costs pursuant to ORS § 646.638 *et seq.*

82.    The unlawful acts and omissions pled herein were, are, and continue to be part of a pattern or generalized course of conduct. Defendant's conduct is ongoing and is likely to continue and recur absent a permanent injunction. Accordingly, Plaintiff seeks an order enjoining Defendant from committing such unlawful practices pursuant to ORS § 646.638(8)(c); ORS § 646.636.

83.    The balance of the equities favors the entry of permanent injunctive relief against Defendant. Plaintiff, the Class members and the general public will be irreparably harmed absent the entry of permanent injunctive relief against Defendant. Plaintiff, the Class members and the general public lack an adequate remedy at law. A permanent injunction against Defendant is in the public interest. Plaintiff is informed and believes and thereon alleges that Defendant's unlawful behavior is ongoing as of the date of the filing of this Complaint. If not enjoined by order of this Court, Defendant will or may continue to injure Plaintiff and Oregon consumers through the misconduct alleged herein. Absent the entry of a permanent injunction, Defendant's unlawful behavior will not cease and, in the unlikely event that it voluntarily ceases, it is capable of repetition and is likely to reoccur.

84.    Defendant's conduct has caused substantial injury to the general public. Plaintiff individually seeks public injunctive relief to protect the general public by putting an end to Defendant's false reference price advertising, false discounts and omissions.

85.    This action was brought "within one year after the discovery of the unlawful method, act or practice." ORS § 646.638(6). The applicable limitations period is expansive and

extends back many years based on the "discovery" rule explicitly provided for in the Oregon Unlawful Trade Practices Act at ORS § 646.638(6). Defendant's unlawful false discounting practices have been pervasive at its Oregon outlet stores—and at the core of its marketing plan—for many years (the exact length of time will be subject to discovery and proof).

86.     Plaintiff and the Class members did not know, and could not have known, that these reference prices and discount representations were false. As the Oregon Supreme Court has explained, "[i]n general terms, a cause of action does not accrue under the discovery rule until the claim has been discovered or, in the exercise of reasonable care, should have been discovered." *FDIC v. Smith* 328 Or. 420, 428, 980 P.2d 141 (1999); *see also Saenz v. Pittenger*, 78 Or.App. 207, 211–12, 715 P.2d 1126 (1986) (UTPA statute of limitations begins running when plaintiff knows or should have known of the allegedly unlawful conduct).

87.     Plaintiff first learned of Defendant's false advertising scheme, and that she was likely a victim of the scheme, on or about May 1, 2024. Prior to that date, Plaintiff was not aware of Defendant's false discount advertising scheme and was not aware that the reference prices and discounts Defendant had previously advertised to her and upon which she had relied in purchasing her products were false. Even though Plaintiff became aware of Defendant's false advertising scheme on or about May 1, 2024, it stands to reason that all, or nearly all, other Class members are *still* unaware of Defendant's deception.

88.     By Defendant's design, its false advertising scheme by its very nature is hidden and virtually impossible for the typical consumer to discover. Consumers who shopped at Ann Taylor Factory Store and LOFT Outlet stores have no way of knowing the true daily price histories and past selling prices for the products they viewed and purchased without substantial, time-consuming, and costly investigation. Thus, Oregon consumers have, and for years have had, no

way to know that the prices printed on the product price tags were fictitious and inflated and that the advertised discounts were false. Consumers have, and for years have had, no way to know that Defendant's false discounting practices extend across all, or virtually all, of Defendant's outlet merchandise.

## VI.    PRAYER FOR RELIEF

Wherefore, Plaintiff, on behalf of herself and on behalf of the other members of the Class, requests that this Court award relief against Defendant as follows:

1.    an order certifying the Class and designating Plaintiff as the Class Representative and her counsel as Class Counsel;

2.    an order that the discovery rule, pursuant to, without limitation, ORS § 646.638(6), applies and that the applicable limitations period—and the corresponding Class Period for the Class—extends back to the very first date that Defendant began engaging in the unlawful conduct alleged herein;

3.    awarding restitution and disgorgement of all profits and unjust enrichment that Defendant obtained from Plaintiff and the Class members as a result of its unlawful, unfair, and fraudulent business practices described herein;

4.    awarding declaratory and injunctive relief as permitted by law or equity, including: preliminarily and permanently enjoining Defendant from continuing the unlawful practices as set forth herein, and directing Defendant to identify, with Court supervision, victims of its misconduct and pay them all money they are required to pay;

5.    retaining jurisdiction to monitor Defendant's compliance with permanent injunctive relief;

6.      awarding actual, punitive and statutory damages, as permitted under the Oregon Unlawful Trade Practices Act;

7.      ordering Defendant to engage in a corrective advertising campaign;

8.      awarding attorneys' fees and costs;

9.      for leave to amend these pleadings to conform to evidence adduced at trial; and

10.     for such other and further relief as the Court may deem necessary or appropriate.

## VIII.   DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial for claims so triable.

Dated: July 11, 2024                     **TOUSLEY BRAIN STEPHENS PLLC**

                                  By:    */s/ Kim D. Stephens*
                                         Kim D. Stephens, P. S. (OR 030635)
                                         kstephens@tousley.com
                                         Joan M. Pradhan
                                         jpradhan@tousley.com
                                         1200 5th Avenue, Suite 1700,
                                         Seattle, WA 98101
                                         Telephone:    (206) 667-0249

                                         **LYNCH CARPENTER LLP**
                                         Todd D. Carpenter (*pro hac vice* forthcoming)
                                         todd@lcllp.com
                                         Scott G. Braden (*pro hac vice* forthcoming)
                                         scott@lcllp.com
                                         James B. Drimmer (*pro hac vice* forthcoming)
                                         jim@lcllp.com
                                         1234 Camino del Mar
                                         Del Mar, CA 92014
                                         Telephone:    619.762.1910
                                         Facsimile:     858.313.1850

                                         *Attorneys for Plaintiff and*
                                         *Proposed Class Counsel*